UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
:
ANTHONY BONCIMINO,                                          :
                                                           :
                                    Plaintiff,             :
                                                           :
                  - against -                              :
                                                           :
                                                           :
NEW YORK STATE UNIFIED COURT                               :
SYSTEM, MICHAEL DEMARCO, JOSEPH                            :
DIBELLO, ROBERT MIGLINO, and                              :
THOMAS RICCIARDI,                                          :
                                                           :
                                    Defendants.            :
                                                           :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  5/15/2018

17-CV-6760 (VSB)

**OPINION & ORDER**

Appearances:

Liane Fisher
Michael Taubenfeld
Fisher Taubenfeld LLP
New York, New York
*Counsel for Plaintiff*

Lisa M. Evans
New York State Office of Court Administration
White Plains, New York
*Counsel for Defendant New York State Unified Court System*

Michael John Siudzinski
New York State Office of the Attorney General
New York, New York
*Counsel for Defendants Michael DeMarco, Joseph Dibello, Robert Miglino, and Thomas Ricciardi*

VERNON S. BRODERICK, United States District Judge:

    Plaintiff Anthony Boncimino brings this action under the Rehabilitation Act of 1973

("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, the Family and Medical Leave Act ("FMLA"),

29 U.S.C. § 2601 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C.

Admin. Code § 8-101 *et seq.*, against the New York State Unified Court System ("NYSUCS"), and individual court officers Major Michael DeMarco, Captain Joseph Dibello, Captain Robert Miglino, and Sergeant Thomas Ricciardi (the "Individual Defendants," and collectively with the NYSUCS, "Defendants"), alleging employment discrimination based on a disability that Plaintiff sustained while working as a court officer. Before me is the Individual Defendants' motion to dismiss Plaintiff's amended complaint. Because I find that Plaintiff plausibly alleges violations of the FMLA and NYCHRL at this stage of the litigation, the Individual Defendants' motion to dismiss is DENIED.

## I.   Background[1]

### A.   *Plaintiff's Employment in the Sixth Judicial District*

After taking a civil service examination and several physical and mental tests, Plaintiff was appointed as a New York State Court Officer Trainee in May 2007. (Am. Compl. ¶¶ 49–50.)[2] In August 2007, he was assigned to serve a two-year term as a probationary trainee in the Sixth Judicial District. (*Id.* ¶ 51.) During his two-year probationary term, Plaintiff "participated in intensive physical training; learned defensive tactics, basic life support, and how to operate firearms; and completed a challenging academic curriculum covering procedural law governing [NYSUCS], the court structure, agency policies and guidelines, arrest procedures, baton and pepper spray use, prisoner handling/escort, counter-terrorism training, bomb detection device

---

[1] The following factual summary is drawn from the allegations of the Amended Complaint, which I assume to be true for the purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] "Am. Compl." refers to the amended complaint ("Amended Complaint") filed January 22, 2018. (Doc. 25.) In the Amended Complaint Plaintiff explicitly states that he brings a Rehabilitation Act claim against the NYSUCS and FMLA and NYCHRL claims against the Individual Defendants. (Am. Compl. ¶¶ 15–16.) Because the instant Opinion and Order only addresses the Individual Defendants' motion to dismiss, I do not consider the Rehabilitation Act claim against the NYSUCS here. Certain of the allegations in the Amended Complaint are capitalized apparently for emphasis; however, to the extent I quote those passages I do not capitalize the sentences.

training, critical incident management, law enforcement mental health, domestic violence awareness, incident command systems, evacuation procedures, oral and written communication skills, defensive driving, and how to interact with the general public." (*Id.* ¶ 52.)

**B.**     ***Plaintiff's Employment with the Bronx Family Court***

In approximately February or March 2009, Plaintiff was transferred to Bronx Family Court where he continued his training. (*Id.* ¶ 54.) In Bronx Family Court, "[v]iolent confrontations are innumerable and occur daily, with officers frequently sustaining injuries in the line of duty." (*Id.* ¶ 55.) Threats and assaults against court officers and court personnel are common. (*Id.*)

In May 2009 Plaintiff completed his training and was promoted to a New York State Court Officer. (*Id.* ¶ 57.) He was assigned to Part 41—where litigants were directed to sign waivers for the assignment of a referee in lieu of a judge. (*Id.* ¶¶ 57, 59.) Part 41 is located on the eighth floor of the Bronx Family Courthouse, which has heavy visitor traffic as it houses several clerks' offices. (*Id.* ¶¶ 57–58.) Plaintiff was routinely the sole court officer providing security for Part 41. (*Id.* ¶ 61.)

**C.**     ***Plaintiff's Injury***

Plaintiff was on duty on January 4, 2012 when another court officer made a distress call over the radio asking for emergency assistance. (*Id.* ¶ 64.) Based on the "audible screaming and commotion" Plaintiff determined that it was in fact an emergency and ran to the court officer's aid. (*Id.* ¶ 65.) While running to help the court officer, Plaintiff felt his left knee lock and felt pain through that knee. (*Id.* ¶ 66.) The pain caused him to stop running, making him unable to help the court officer with the emergency. (*Id.*)

Rather than going to the hospital immediately after the incident, Plaintiff continued

reporting to work. (*Id.* ¶ 67.) He only sought treatment from orthopedists in the weeks and months after the incident "as his knee injury grew progressively worse." (*Id.* ¶ 68.) By November 2012 he could no longer report to work because of the pain, and at that time he requested and commenced "line of duty medical leave." (*Id.* ¶ 70.) He was diagnosed with a torn medial meniscus in his left knee and underwent surgery for the tear on December 7, 2012. (*Id.* ¶¶ 71–72.) Plaintiff continued to have chronic pain even after the surgery, and was subsequently diagnosed with peroneal nerve neuropathy in his left knee. (*Id.* ¶ 73.) He had a second surgery on July 18, 2013 for the peroneal nerve neuropathy. (*Id.* ¶ 74.) During this period, and for a total of approximately two years, Plaintiff was on workers' compensation medical leave. (*Id.* ¶ 75.)

In December 2014, Plaintiff's doctor cleared him to return to work "on light duty." (*Id.* ¶ 76.) Defendants refused to let Plaintiff return to work unless he returned on full duty, even though Plaintiff believes there were light duty positions available for which he was qualified. (*Id.* ¶ 78.) On May 18, 2015, Plaintiff returned to work at the Bronx Family Court on full duty with clearance from his doctor. (*Id.* ¶ 80.)

On Plaintiff's first day back at the Bronx Family Court, the identification card that he used to swipe in and out of the courthouse was not working. (*Id.* ¶ 81.) Plaintiff brought this to the attention of one of the sergeants who told Plaintiff that it would be fixed. (*Id.*) Plaintiff received a telephone call from Dibello[3] regarding the identification card the next day, and when Plaintiff tried to explain the situation, Dibello screamed at Plaintiff, telling Plaintiff that he did not like Plaintiff because he was "broken" and that Plaintiff should "listen to [him]" because he

_____

[3] Dibello is described as a "a senior commanding officer of [NYSUCS] with the rank and title of lieutenant, who at all relevant times supervised [Plaintiff's] work and maintained and exercised the authority to determine the terms and conditions of [Plaintiff's] employment." (Am. Compl. ¶ 45.)

was a lieutenant. (*Id.* ¶¶ 82–85.) Dibello then told Plaintiff to contact Human Resources to fix the issue with the identification card and hung up on Plaintiff. (*Id.* ¶ 86.) Plaintiff complained to Miglino[4] about Dibello's outbursts over the phone. (*Id.* ¶ 87.)

### D. *Plaintiff's Transfer to Manhattan Family Court*

Plaintiff was transferred to Manhattan Family Court and began working there in late May 2015. (*Id.* ¶ 89.) Plaintiff was assigned to Part 2 at the Manhattan Family Court, which handles custody, visitation, and protection orders. (*Id.*) Within the first few days, Dibello told Plaintiff's new partner to make sure that Plaintiff did "*all* the work" and "d[id] not slack" and that the partner should let Dibello know if Plaintiff failed to do so. (*Id.* ¶ 90.) When Plaintiff learned of this interaction and again complained to Miglino, Miglino told Plaintiff that Dibello had told him that Plaintiff "came to [them] broken." (*Id.* ¶¶ 91–92.) Miglino also told Plaintiff that DeMarco[5] did not like Plaintiff because Plaintiff was injured.[6] (*Id.* ¶ 93.)

On September 30, 2015, Plaintiff rushed to assist with another emergency in the courthouse involving a combative litigant. (*Id.* ¶ 97.) As he was helping, Plaintiff "severely injured his arm on a ledge when the court officers and litigant fell on top of him, forcing him to the ground under approximately 1000 pounds of weight." (*Id.* ¶ 98.) Immediately thereafter, Plaintiff went to the courthouse's Operations Office where several supervisors and court officers were stationed. (*Id.* ¶¶ 99–100.) When Plaintiff arrived, Miglino and several other court officers

---

[4] Miglino is described as "a senior commanding officer of [NYSUCS] with the rank and title of captain, who at all relevant times supervised [Plaintiff's] work and maintained and exercised the authority to determine the terms and conditions of [Plaintiff's] employment." (Am. Compl. ¶ 46.)

[5] DeMarco is described as "a senior commanding officer of [NYSUCS] with the rank and title of major. He controls the family court system throughout the City of New York and has been a court officer for several decades." (Am. Compl. ¶ 44.)

[6] Plaintiff states in his Amended Complaint that "Defendants never followed-up with Officer Boncimino about his complaint." (Am. Compl. ¶ 96.) It is unclear which Defendants he is referring to and whether Plaintiff formally filed any complaints against any of the Individual Defendants. Plaintiff alleges that he "complained" to Miglino and that nobody followed up about his "complaint." (*See id.* ¶¶ 91, 96.)

and staff "began laughing at and mocking him." (*Id.* ¶ 101.) Plaintiff heard Defendants, including Individual Defendants,[7] refer to him as "fragilmino"—a combination of the word "fragile" with his last name—a word that, according to Plaintiff, Defendants used throughout the next two years of his employment. (*Id.* ¶ 102.) Plaintiff told Defendants to stop using the term, but Defendants continued to do so. (*Id.* ¶ 103.) Miglino was present and "participated in, if not spearheaded," the mockery. (*Id.* ¶ 104.) Defendants continued laughing at and mocking Plaintiff while paramedics evaluated his injuries in the Operations Office. (*Id.* ¶ 105.)

After the injury Plaintiff was accompanied by another court officer, Michael Augello, to the local emergency room. (*Id.* ¶¶ 106–07.) While in the emergency room, Augello took a picture of Plaintiff lying in a hospital bed. (*Id.* ¶ 108.) Doctors then took x-rays of the injury and discharged Plaintiff on the same day that the incident occurred. (*Id.* ¶ 109.) After he was discharged, Plaintiff returned to the Operations Office in the courthouse, where "the laughter and mockery resumed." (*Id.* ¶¶ 111–12.) Plaintiff commenced medical leave the next day due to his injuries from the incident, and he was later diagnosed with lateral epicondylitis, or tennis elbow, which required ongoing physical therapy and steroid injections. (*Id.* ¶¶ 110, 114.)

Plaintiff learned that while he was on medical leave Defendants had posted, in the Operations Office, the picture that Augello took of him in the hospital bed with the word "fragimino" written on it. (*Id.* ¶ 114.) Defendants had also "posted several discriminatory images on his locker making fun of him for his disability." (*Id.* ¶ 115.) The other images included (1) the picture of Plaintiff in the hospital bed altered to depict Plaintiff in a full body cast; (2) a picture of a cartoon character with "Mr. Glass for the really tough jobs" written across of it; (3) a picture of a woman who had fallen and needed medical assistance; (4) a picture of the

[7] Plaintiff defines "Defendants" to include the Individual Defendants in his Amended Complaint. (*See* Am. Compl.)

work-injury claim form stamped with the word "rejected;" and (5) a picture of a different cartoon character in a body cast. (*Id.* ¶ 116.) Another court officer, William Borden, sent Plaintiff a photograph of Augello's friend "smirking while standing with his head close to [the] derogatory images." (*Id.* ¶ 115.)

After going on medical leave for approximately one week, Plaintiff submitted a request to return to work on light duty. (*Id.* ¶ 118.) DeMarco made the decision to deny Plaintiff's light duty request "without engaging in the interactive process to determine what, if any, accommodation or light duty assignment he required." (*Id.* ¶¶ 119–20.) Plaintiff was told that he could only return to work on fully duty. (*Id.* ¶ 121.)

Plaintiff decided to return to work on full duty in December 2015, and when he returned, he was assigned to work on the eleventh floor of the courthouse without a partner who could relieve him for breaks. (*Id.* ¶¶ 123–24.) On his first day back at work, Plaintiff found the picture that Augello had taken of him in the hospital bed posted on his locker. (*Id.* ¶ 125.) Plaintiff "complained to his supervisors" but "Defendants took no remedial action to investigate [Plaintiff's] complaint." (*Id.* ¶¶ 126–27.) Instead, Defendants continued their mocking behavior by routinely calling Plaintiff "fragimino" or "fragilmino" and posting photographs of him in various areas of the courthouse. (*Id.* ¶¶ 129–32.) Plaintiff was again assigned to Part 2 in January 2016, and when he picked up the clipboard containing the day's calendar—which was accessible to all attorneys, litigants, and court officers—the picture of him in the hospital bed had been placed at the top. (*Id.* ¶¶ 134–36.)

Plaintiff's knee injury recurred in early 2016, causing him to walk with a limp. (*Id.* ¶ 137.) In approximately February or March 2016, an MRI showed a cyst and continued peroneal neuropathy in Plaintiff's left knee stemming from the injury he sustained on duty in

2012.  (*Id.* ¶ 138.)  Defendants started calling Plaintiff "limpy gimpy," and when Plaintiff told his supervisors that he was in pain and needed to leave work for doctor's appointments, they told him to "suck it up" and "toughen up" and forbade him from calling in sick.  (*Id.* ¶¶ 137, 139–40.) As his pain got worse, however, he had to take time off of work.  (*Id.* ¶ 141.)

In April 2016, Plaintiff found the picture of him in the hospital bed photoshopped to depict him in a bubble suit posted both inside his locker and in the Part 2 courtroom.  (*Id.* ¶ 142.) He "immediately complained to . . . Miglino, who, again, did nothing to investigate [Plaintiff's] complaint."  (*Id.* ¶ 143.)  Around the same time, Defendants told Plaintiff that he should "be put in a bubble."  (*Id.* ¶ 144.)  In September 2016, Defendants wrote the words "fragile, handle with care" and "Mr. Glass, for the really tough jobs" on a piece of cardboard and put it on Plaintiff's locker.  (*Id.* ¶ 148.)  Plaintiff felt increasingly alienated—he ate lunch by himself and rarely talked to, or interacted with, his colleagues.  (*Id.* ¶¶ 146–47.)

On January 17, 2017, Plaintiff was working in Part 10 when a litigant refused to leave the courtroom during a recess.  (*Id.* ¶ 150.)  Plaintiff was the only officer standing between the litigant and the presiding judge, and asked the litigant to exit the courtroom.  (*Id.* ¶¶ 151–52.)  In response, the litigant "slammed the phone charger she was holding on a courtroom table and screamed 'I am not going anywhere.'"  (*Id.* ¶ 152.)  She sat back down, but a short while later, jumped up, charged, and hit Plaintiff's female partner.  (*Id.*)  Plaintiff tried to restrain the litigant, and when another officer came to assist him, the litigant threw herself to the ground, taking Plaintiff down with her.  (*Id.* ¶¶ 153–55.)  The litigant also bit Plaintiff's left ring finger which started bleeding.  (*Id.* ¶ 156.)

Following this incident, paramedics evaluated Plaintiff's condition in the Operations Office.  (*Id.* ¶ 158.)  Plaintiff was "extremely distraught and anxious given the immense pain he

was in and because the litigant who bit him was a homeless prostitute who may have exposed him to infectious disease." (*Id.* ¶ 159.) While he was being examined, someone in the Operations Office yelled "fragimino is back," and other officers, while laughing, called him "fragimino" or "fragilmino." (*Id.* ¶ 160.)

Plaintiff was sent to the hospital in an ambulance for his injuries, but Defendants did not assign an officer to accompany him as was required by protocol. (*Id.* ¶¶ 161–62.) Once he arrived at the hospital, doctors examined him, disinfected the wound, took blood tests, gave him a tetanus shot and pain killers, and wrote him prescriptions for antibiotics and HIV prophylactics. (*Id.* ¶ 164.) He had high blood pressure and anxiety. (*Id.* ¶ 163.) In his discharge paperwork the doctors outlined Plaintiff's various injuries—which he sustained to his finger, knee, hip, and back—and directed him to stay home for three days. (*Id.* ¶ 165.) After being discharged, Plaintiff went to work to explain to a lieutenant in the Operations Office that he had to stay home because he "needed to follow-up with various physicians, undergo blood testing, and commence anti-retroviral medications to avoid contracting an infectious disease." (*Id.* ¶ 166.) Although a few court officers were also in the Operations Office, none of them expressed sympathy. (*Id.*)

On January 19, 2017, Plaintiff was approved for FMLA leave until February 21, 2017. (*Id.* ¶ 167.) He took leave through February 6, 2017, came back to work on light duty starting February 7, 2017, and took intermittent leave thereafter. (*Id.* ¶¶ 168, 170.) Plaintiff learned that while he was on leave, "one of the Defendants questioned the legitimacy of his injury" by "facetiously asking whether [Plaintiff] had simply been scratched or scratched himself." (*Id.* ¶ 169.) Further, on his first day back at work, he found in his locker a photoshopped image of him lying in a bubble suit, and Defendants continued to taunt him by calling him "fragmino" or "fragilmino" and in one instance asking if they needed to call an ambulance to have Plaintiff

testify in criminal court when Plaintiff was called to testify before a grand jury. (*Id.* ¶¶ 171–74.) On March 9, 2017, Miglino and other supervising officers called Plaintiff to a meeting where they told Plaintiff that they understood he had injuries but that he "need[ed] to be here or [they could] label [Plaintiff] a sick leave abuser." (*Id.* ¶ 176.) Immediately thereafter, Plaintiff complained to Cheryl Bullock in Human Resources about the supervising officers' conduct. (*Id.* ¶ 177.) Bullock told Plaintiff that there were some people in the court system who missed 40–50 days per year but were still not labeled "sick leave abusers." (*Id.*)

### E. *Plaintiff's Transfer to Brooklyn Family Court*

On March 16, 2017, DeMarco called Plaintiff into a meeting where he told Plaintiff: "I don't need you here any more. You're not doing anything for me. I need you to do more law enforcement work." (*Id.* ¶ 179.) DeMarco then informed Plaintiff that he would be transferred to Brooklyn Family Court and report to Dibello—the same individual who had called him "broken" previously. (*Id.*) DeMarco then called Miglino in front of Plaintiff and told Miglino that he was "transferring [Plaintiff] to Brooklyn" because they "need[ed] officers that c[ould] work" and that he was "going to try to get [Miglino] another officer." (*Id.* ¶ 180.)

Plaintiff started at Brooklyn Family Court on March 20, 2017. (*Id.* ¶ 181.) At that time, Captain John Posillipo, who did not know of Plaintiff's injuries, assigned Plaintiff to fingerprinting duty. (*See id.*) "Fingerprinting is labor-intensive, as it requires standing for prolonged periods of time and physical exertion to manipulate the subject's body and hand, and is done by full duty officers, not light duty officers." (*Id.*) Despite the fact that Plaintiff told the sergeant on duty that he had limitations due to his injuries, that fingerprinting would be too physically tiring, and that he was not feeling well, the sergeant forced Plaintiff to continue with fingerprinting. (*Id.*) This meant that Plaintiff was required to "stand and manipulate bodies for

fingerprinting" for hours at a time. (*Id.* ¶ 182.)

On March 22, 2017, Plaintiff was "directed by his orthopedist to take a line-of-duty medical leave of absence from work and was referred to an orthopedic specialist." (*Id.* ¶ 183.) Plaintiff sent an email to Human Resources explaining that he needed another leave of absence and attaching his doctor's note. (*Id.* ¶ 184.) Plaintiff was approved for FMLA leave until March 31, 2017. (*Id.* ¶ 185.) On March 28, 2017, Plaintiff was told by an orthopedic specialist that he needed to stay on medical leave, and the specialist's office submitted paperwork to the Brooklyn Family Court to facilitate an extension of leave. (*See id.* ¶ 186.) On March 30, 2017, Plaintiff received a telephone call from Della Nelson in Human Resources accusing Plaintiff of "lying about his hip injury" and "reporting injury to the wrong hip." (*Id.* ¶ 187.) Nelson told Plaintiff that he would not be covered by workers' compensation for his hip or back injury, implying that they were not real injuries. (*See id.*) Nelson also told Plaintiff that he would have to use his own paid time off and apply for a non-work-related absence. (*Id.*)

After this incident, in April 2017, Plaintiff went to a physiatrist, who diagnosed Plaintiff with sprain/strain to his left hip, knee, and lower back, as well as lumbar radiculopathy. (*Id.* ¶ 188.) Plaintiff's MRI showed two herniated discs in his back and his EMG nerve conduction study showed nerve root impingement and left peroneal nerve neuropathy. (*Id.*) Plaintiff provided Defendants with the physiatrist's report and requested FMLA leave between April 3, 2017 and May 31, 2017. (*Id.* ¶ 189.) Defendants never responded to this request, and when Plaintiff applied to return to work on light duty in mid-May, Plaintiff's application was denied. (*Id.* ¶¶ 189, 191.) Defendants only allowed Plaintiff to return to work on light duty after he had used all of his paid time off on June 12, 2017. (*Id.* ¶¶ 192–93.)

Plaintiff reported to DeMarco at 9:00 a.m. on June 12, 2017. (*Id.* ¶ 193.) When Plaintiff

met with DeMarco, DeMarco demanded that Plaintiff tell him about each doctors visit going forward, and stated that he "d[idn't] know how [Plaintiff would] go to the doctor" because Plaintiff had "no more time left." (*Id.* ¶ 194.) DeMarco then told a sergeant to take Plaintiff to his new assignment. (*Id.*) Within the first few days of Plaintiff's return, Plaintiff learned that a captain had told one of the senior court analysts that Plaintiff was a "rat" and "c[ould not] be trusted." (*Id.* ¶ 195.) On August 17, 2017, Ricciardi[8] came into Plaintiff's office to inform him that his locker had been relocated next to a soda machine in a different locker room, and demanded to know when Plaintiff would be back on full rather than light duty. (*Id.* ¶¶ 199–200.) When Plaintiff went to his new locker, he found a piece of paper with the word "cunt" above his forged signature and a notary stamp. (*Id.* ¶¶ 201–02.) He also found an image of him in full body armor with a cardboard cutout spelling out "fragile handle with care." (*Id.* ¶ 202.)

Upon seeing these images, Plaintiff had a panic attack and left work to visit the emergency room. (*See id.* ¶ 203.) The doctor gave him medication for the panic attack and recommended taking time off of work. (*Id.* ¶ 204.) Since that time, Plaintiff has not returned to work and has met with multiple medical professionals for "severe mental and emotional distress and physical impairment." (*Id.* ¶ 205.)

On August 25, 2017, Plaintiff sent Human Resources and the Workers' Compensation Unit a note from his therapist directing Plaintiff to take a three-week medical leave of absence. (*Id.* ¶ 206.) On August 28, 2017, while Plaintiff was at home, a sergeant and officer showed up and demanded to know the status of Plaintiff's condition. (*See id.* ¶¶ 207–08.) They also demanded that Plaintiff call DeMarco. (*See id.*) The sergeant and officer left for a period, but

---

[8] Ricciardi is described as "a senior commanding officer of [NYSUCS] with the rank and title of sergeant, who at all relevant times supervised [Plaintiff's] work and maintained and exercised the authority to determine the terms and conditions of [Plaintiff's] employment." (Am. Compl. ¶ 47.)

came back to Plaintiff's door a few minutes later demanding to see Plaintiff's identification card and again demanding that Plaintiff call DeMarco. (*See id.* ¶ 209.) They left and came back a third time when Plaintiff was taking a shower. (*Id.* ¶ 210.) When Plaintiff finished showering he found a note from the officers again instructing him to call DeMarco. (*See id.* ¶ 211.) Around the same time, somebody contacted Plaintiff's mother and left a voicemail demanding that Plaintiff contact DeMarco. (*Id.* ¶ 212.) This caused Plaintiff to have another panic attack and he went to the local urgent care facility. (*Id.* ¶ 213.) There he was diagnosed with anxiety and diarrhea and instructed to stop working temporarily. (*Id.*) Plaintiff notified Human Resources of the "harassment in his home and of his mother," but Human Resources "failed to respond or even acknowledge [Plaintiff's] complaint." (*Id.* ¶ 214.)

On June 22, 2017, Plaintiff had received news that all of his injuries were deemed "work-related" and that his absences were covered "as leave for a line-of-duty injury." (*Id.* ¶ 197.) On August 30, 2017, however, Human Resources told Plaintiff that Plaintiff's August 17, 2017 panic attack was "not considered to be workers' compensation related." (*Id.* ¶ 216.) To date, Plaintiff "remains out of work on medical leave." (*Id.* ¶ 217.)

## II.    <u>Procedural History</u>

Plaintiff filed his complaint against the NYSUCS and the Individual Defendants on September 5, 2017 ("Complaint"). (Doc. 1.) On November 16, 2017, the NYSUCS filed its answer to the Complaint. (Doc. 17.) On the same day, the Individual Defendants filed a letter requesting a pre-motion conference in anticipation of filing a motion to dismiss. (Doc. 20.) After Plaintiff filed a response on November 21, 2017, (Doc. 21), on November 22, 2017, I granted the Individual Defendants leave to file their motion to dismiss, (Doc. 22). Subsequently, on January 22, 2018, Plaintiff filed the Amended Complaint. (Doc. 25.) The NYSUCS filed its

answer to the Amended Complaint on February 16, 2018, (Doc. 28), and the Individual

Defendants filed their motion to dismiss the Amended Complaint, along with a memorandum of

law in support of their motion to dismiss, on the same day, (Docs. 30–31).  Plaintiff filed his

memorandum of law in opposition to the motion to dismiss on March 14, 2018, (Doc. 37), and

the Individual Defendants filed their reply on April 4, 2018, (Doc. 40).

### III.    <u>Legal Standard</u>

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Id.*  This standard demands "more than a sheer possibility that a defendant has acted

unlawfully."  *Id.*  "Plausibility . . . depends on a host of considerations:  the full factual picture

presented by the complaint, the particular cause of action and its elements, and the existence of

alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *L-7*

*Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts

alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor.

*Kassner*, 496 F.3d at 237.  A complaint need not make "detailed factual allegations," but it must

contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a

cause of action."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Although all

allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal

conclusions."  *Id.*

## IV.    Discussion

### A.    *FMLA Retaliation Claim*

#### 1.  Applicable Law

A plaintiff may make out a claim for retaliation under the FMLA where an employer discriminates against him for exercising his right to take FMLA leave.  *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174–77 (2d Cir. 2006); *Potenza v. City of New York*, 365 F.3d 165, 167–68 (2d Cir. 2004) (per curiam).  A prima facie case of retaliation under the FMLA requires a plaintiff to show that "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016) (quoting *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012)).  At the summary judgment stage, retaliation claims under the FMLA are analyzed under the burden shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See id.*  Accordingly, a plaintiff must first establish a prima facie case, and if the plaintiff does so, the defendant must provide a legitimate, non-discriminatory reason for its actions.  *Id.*  If the defendant succeeds, then the plaintiff must show that the defendant's explanation is a pretext.  *See id.*

For the purpose of a motion to dismiss, however, a complaint asserting an FMLA retaliation claim "need not plead specific facts establishing a prima facie case of discrimination in order to survive" and the plaintiff "need only show that his claims are plausible under *Iqbal* and *Twombly* by pleading facts sufficient to state a claim to relief that is plausible on its face." *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 469 (S.D.N.Y. 2011) (internal quotation marks omitted).  "[T]he *McDonnell Douglas* burden-shifting framework is an evidentiary standard, not

a pleading requirement, and . . . to require more than Rule 8(a)'s simplified notice pleading standard would unjustifiably impose a heightened pleading requirement on the plaintiff." *Boykin v. KeyCorp*, 521 F.3d 202, 212 (2d Cir. 2008) (citations and internal quotation marks omitted); *see also Smith*, 769 F. Supp. 2d at 469 ("[A] complaint asserting an employment discrimination claim, including an FMLA retaliation claim, need not plead specific facts establishing a prima facie case of discrimination in order to survive a motion to dismiss." (quoting *Peterson v. Long Island R.R.*, No. 10 Civ. 480(ILG), 2010 WL 2671717, at *2 (E.D.N.Y. June 30, 2010))).

Although traditional adverse employment actions are those that cause a materially adverse change in the terms and conditions of employment such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities," it may apply "more broadly to employer actions that would have been materially adverse to a reasonable employee" such as actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Smith*, 769 F. Supp. 2d at 470–71 (internal quotation marks omitted). "[E]ven minor acts of retaliation can be sufficiently substantial in gross as to be actionable." *Id.* at 471 (quoting *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)). While this standard is typically applied to Title VII retaliation claims, the Second Circuit has extended this standard to ADA retaliation claims, and several courts in this District have also extended this standard to FMLA retaliation claims. *See id.*; *see also Gonzalez v. Carestream Health, Inc.*, 520 F. App'x 8, 10–11 & n.2 (2d Cir. 2013) (stating that Plaintiff's allegations that following FMLA leave, his supervisors reprimanded him, placed him on performance improvement, and terminated him were sufficient to adequately state an FMLA retaliation claim because "adverse employment action may take many forms . . . [and] even minor acts of

retaliation can be sufficiently substantial in gross as to be actionable" (internal quotation marks omitted)); *Behringer v. Lavelle Sch. for Blind*, No. 08 Civ. 4899(JGK), 2010 WL 5158644, at *15 (S.D.N.Y. Dec. 17, 2010) ("This standard, which is applied to Title VII and ADA claims, should reasonably be applied to retaliation claims under the FMLA. There is no basis to distinguish FMLA retaliation claims.").

## 2. Application

Here, the Individual Defendants do not dispute that they may be held liable under the FMLA,[9] that Plaintiff exercised his rights protected under the FMLA, and that Plaintiff was qualified for the position. Rather, the Individual Defendants argue that Plaintiff's FMLA claims against them should be dismissed because "Plaintiff fails to establish that he suffered an adverse employment action" and "there is no inference of retaliatory intent." (*See* Defs.' Mem. 7–9.)[10] Further, the Individual Defendants argue that because, according to the allegations in the Amended Complaint, only DeMarco was involved in the transfer from Bronx Family Court to Brooklyn Family Court, the claim must be dismissed against Dibello, Miglino, and Ricciardi. (*Id.* at 9.)

As an initial matter, the Amended Complaint does not specify that the transfer from Bronx Family Court to Brooklyn Family Court was the only "adverse employment action" that took place. (*See* Am. Compl. ¶¶ 255–58 (stating that the cause of action arises out of the Individual Defendants "harassing him" following the injury he sustained in January 2017).) Thus, the Individual Defendants' argument that the claim must be dismissed against Dibello,

---

[9] The Individual Defendants may be held liable under the FMLA because the statute "explicitly provides for individual defendant liability" and "a fair reading of the plain language of the statute does not exclude public employees from individual liability." *Smith*, 769 F. Supp. 2d at 473–74.

[10] "Defs' Mem." refers to the Memorandum of Law in Support of Defendant Court Officers' Motion to Dismiss the Amended Complaint, filed February 16, 2018. (Doc. 31.)

Miglino, and Ricciardi is unpersuasive, as I will look to the allegations as a whole to determine whether the Individual Defendants' actions constitute adverse employment actions sufficient to state a FMLA retaliation claim.

Looking at the allegations of the Amended Complaint as a whole, I find that the Individual Defendants' actions "could plausibly dissuade a reasonable worker" from exercising rights under the FMLA, and thus Plaintiff states a claim that survives a motion to dismiss. *Behringer*, 2010 WL 5158644, at *15. All, if not most, of the Individual Defendants' statements and actions are related to Plaintiff's alleged injuries and/or medical conditions for which he requested FMLA accommodations, and therefore could be seen as directly impacting the exercise of his rights under the FMLA. Harassment by supervisors may constitute "adverse employment actions" such as would make out a prima facie FMLA retaliation claim. *See Smith*, 769 F. Supp. 2d at 471 (finding the fact that the plaintiff was "harassed by his supervisors, taken off his post, and ordered to perform duties outside his job description" would "constitute adverse employment actions" for the purpose of an FMLA retaliation claim). In addition, it is reasonable to infer that the views of Dibello, Miglino, and Ricciardi—as Plaintiff's supervisors and/or superiors—could have played a role in Plaintiff's transfer to Brooklyn Family Court. Further, at the motion to dismiss stage, plaintiff "need not establish a prima facie case" and "need only show that her claims are plausible under *Iqbal and Twombly*." *Harper v. N.Y.C. Hous. Auth.*, 673 F. Supp. 2d 174, 180 (S.D.N.Y. 2009).

Thus, Plaintiff's allegations that, following his January 2017 injury, officers repeatedly and continuously, among other things, called him "fragimino" or "fragilmino," (Am. Compl. ¶¶ 3, 160, 174), that they had posted photoshopped images of him wearing a bubble suit, (*id.* ¶¶ 171–74), that he was told that he "wasn't doing anything" and "need[ed] . . . to do more law

18

enforcement work," (*id.* ¶ 179), that he was made to do fingerprinting work over his objections

that it would cause his injuries to get worse, (*id.* ¶ 181), and that he was denied light duty work,

(*id.* ¶¶ 77, 191), are sufficient to survive a motion to dismiss, *see Harper*, 673 F. Supp. 2d at 179

(finding that the plaintiff's allegations that "her job location changed, and that she was stripped

of certain privileges that she had before taking FMLA leave" was sufficient to survive a motion

to dismiss). Further, the fact that Human Resources allegedly denied Plaintiff's leave benefits on

the basis that his panic attack was "not . . . workers' compensation related" could also dissuade a

worker from exercising his rights. (Am. Compl. ¶ 216.) Accordingly, the Individual

Defendants' motion to dismiss is denied as to Plaintiff's FMLA retaliation claim against them.

### B. *Discrimination Claims Pursuant to the NYCHRL*

#### 1. Disability Discrimination

##### a. Discriminatory Conduct

The NYCHRL prohibits discrimination against disabled employees on the basis of his or

her disability. *See* N.Y.C. Admin Code § 8-107(1)(a) ("It shall be . . . unlawful . . . [f]or an

employer or an employee or agent thereof, because of the actual or

perceived . . . disability . . . status of any person . . . to bar or to discharge from employment such

person; or . . . [t]o discriminate against such person in compensation or in terms, conditions or

privileges of employment."). These claims are also governed by the *McDonnell Douglas*

framework. *See Harper*, 673 F. Supp. 2d at 180. As discussed above, however, at the motion to

dismiss stage, "the ordinary rules for assessing the sufficiency of a complaint apply" because

"the Supreme Court 'has never indicated that the requirements for establishing a prima facie case

under *McDonnell Douglas* also apply to the pleading standard that a plaintiff must satisfy in

order to survive a motion to dismiss.'" *Id.* (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506,

511 (2002)).

In order to be considered "disabled" under the NYCHRL, one must have a "physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y.C. Admin Code § 8-102(16)(a). The definition of "disability" under the NYCHRL is broad and "includes an impairment of normal bodily function or an impairment of any system of the body." *Katz v. Adecco USA, Inc.*, 845 F. Supp. 2d 539, 548–49 (S.D.N.Y. 2012) (citations and internal quotation marks omitted). It does not require "any showing that the disability substantially limits a major life activity." *Id.* at 549 (quoting *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 541 (S.D.N.Y. 2009)).

The Individual Defendants argue that Plaintiff's claim for disability discrimination against them must be dismissed because Plaintiff has not demonstrated that he is "disabled" under the NYCHRL. (*See* Defs.' Mem. 10–11.) However, I find that Plaintiff has made a sufficient showing—under the NYCHRL's broad definition of disability—that his injuries caused "impairment of normal bodily function or an impairment of any system of the body." *Katz*, 845 F. Supp. 2d at 548 (citations and internal quotation marks omitted). At various points during his career at the NYSUCS, Plaintiff was diagnosed with multiple medical impairments such as a torn medial meniscus and peroneal nerve neuropathy in his left knee, (Am. Compl. ¶¶ 71–73), tennis elbow, (*id.* ¶ 110), and sprains to his left hip, knee and lower back, (*id.* ¶ 188). His left knee injury required two surgeries and necessitated that he go on workers' compensation medical leave for approximately two years until his doctor cleared him to return to work on "light duty." (*Id.* ¶¶ 71–76.) In early 2016, when his knee injury recurred, Plaintiff started walking with a limp. (*Id.* ¶ 137.) These injuries plausibly show that Plaintiff had a "disability" that impaired his normal bodily function.

The Individual Defendants also argue that Plaintiff fails to plead harassment and discrimination because he does not "demonstrate unequal treatment based upon membership in a protected class or trait." (Defs.' Mem. 14.) They state that "[a]lthough plaintiff repeatedly alleges that various individuals employed by OCA engaged in name-calling, posting pictures of plaintiff, and mocking plaintiff for his injuries . . . plaintiff fails to allege that these officers ever engaged in such behavior," and that the specific allegations in the Amended Complaint are either hearsay or not discriminatory. (*See id.* at 14–16.) Because the name-calling, posting of pictures, and mocking alleged in the Amended Complaint create a plausible claim for discrimination under the NYCHRL at this early stage of the litigation, however, I find that Plaintiff's allegations survive the Individual Defendants' motion to dismiss. *See Harper*, 673 F. Supp. 2d at 180 ("Plaintiff's complaint need not lay out a prima facie case of discrimination; rather, plaintiff need only plead enough facts that, if true, state a claim to relief that is plausible on its face." (internal quotation marks omitted)). Although Plaintiff does not specify an Individual Defendant in each instance, all of the Individual Defendants were employed by the NYSUCS, worked in various courthouses with Plaintiff, and plausibly took part in the alleged mocking and harassment. (*See, e.g.*, Am. Compl. ¶¶ 44–47.) With regard to the Individual Defendants assertion that the allegations are hearsay, the law does not require that the allegations in a complaint be admissible evidence. *See Campanella v. Cty. of Monroe*, 853 F. Supp. 2d 364, 378 (W.D.N.Y. 2012) ("Although, as pleaded, these allegations are based on hearsay, that does not bar the Court from considering them on a motion to dismiss. Neither *Twombly* nor *Iqbal* altered the rule that a plaintiff need not plead specific, admissible evidence in support of a claim, and a contrary rule would confuse the principles applicable to a motion to dismiss with those governing a motion for summary judgment."). Thus, the Individual Defendants' motion to dismiss with respect to

Plaintiff's disability claim under the NYCHRL is denied.

b. Failure to Accommodate

Discrimination under the NYCHRL also includes an employer's failure to provide reasonable accommodation for an employee with a disability. *See Snowden v. Trustees of Columbia Univ.*, 612 F. App'x 7, 10 (2d Cir. 2015) (summary order); *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 73 (S.D.N.Y 2016). To plead a case for disability discrimination for failure to accommodate, the plaintiff must show "(1) his employer was subject to the . . . NYCHRL; (2) he was disabled, within the meaning of those statu[t]es; (3) he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Fernandez v. Windmill Distrib. Co.*, 159 F. Supp. 3d 351, 366 (S.D.N.Y. 2016); *see also Nieblas-Love*, 165 F. Supp. 3d at 73. Further, in NYCHRL failure to accommodate cases, the employer has the obligation to "prove that the employee could not, with reasonable accommodation, satisfy the essential requisites of the job." *Romanello v. Intesa Sanpaolo, S.p.A.*, 976 N.Y.S.2d 426, 429 (2013) (internal quotation marks omitted). "[P]rovisions of the [NYCHRL] should be construed 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'" *Id.* at 428–29 (quoting *Albunio v. City of New York*, 922 N.Y.S.2d 244, 246 (2011)).

Plaintiff claims that the Individual Defendants failed to accommodate his disability by refusing to assign him to "light duty." (*See* Am. Compl. ¶¶ 76–80, 118–22.) The Individual Defendants claim that Plaintiff fails to plead a claim for failure to accommodate because Plaintiff fails to allege that the Individual Defendants had any personal involvement with the decision to employ him on full duty rather than light duty. (*See* Defs.' Mem. 12–14.) I find, however, that

Plaintiff's claim survives the motion to dismiss, and that the extent of the Individual Defendants' direct or indirect involvement in the decision to employ Plaintiff on full duty is an issue for discovery. Plaintiff is considered "disabled" under the NYCHRL, as discussed above. Further, he was otherwise qualified to perform the essential functions of the job—he took the civil service examination, completed his training, and became an active and fully-qualified court officer in 2009. (*See* Am. Compl. ¶ 57.) Although the Individual Defendants claim that "Plaintiff . . . fails to plead any facts to demonstrate that he could perform the essential duties of his job with an accommodation," (Defs.' Mem. 13), Plaintiff states in his Amended Complaint that after his surgeries, his doctor cleared him to return to work on "light duty" but Defendants, including the Individual Defendants, refused to let Plaintiff return, (Am. Compl. ¶¶ 76–77). Similarly, after his 2015 injury, Plaintiff states that he requested to go on light duty but that the Individual Defendants, including DeMarco, denied the light duty request "without engaging in the interactive process." (*Id.* ¶¶ 119–20.) These allegations are sufficient to make out a failure to accommodate claim under the NYCHRL at this early stage of the litigation, and thus the Individual Defendants' motion to dismiss with respect to Plaintiff's NYCHRL failure to accommodate claim is also denied.

### 2. Retaliation

To prevail on a NYCHRL retaliation claim, a plaintiff must show: "1) he engaged in a protected activity; 2) his employer was aware of that activity; 3) he suffered an action that would be reasonably likely to deter a person from engaging in a protected activity; and 4) that there was a causal connection between the protected activity and the action." *Pilgrim v. McGraw-Hill Cos.*, 599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009); *see also* N.Y.C. Admin. Code § 8-107(7) ("It shall be unlawful discriminatory practice for any person engaged in any activity to which this

chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, or (v) provided any information to the commission pursuant to the terms of a conciliation agreement . . . .").  As with the retaliation claims under the FMLA, "the plaintiff need not prove any adverse employment action" and he need only "prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 446 (S.D.N.Y. 2011) (quoting *Gutierrez v. City of New York*, 756 F. Supp. 2d 491, 509 n.12 (S.D.N.Y. 2010)).

Here, Plaintiff alleges that on multiple occasions he complained to Human Resources and to Miglino regarding his treatment by colleagues and managers following his injuries.  (*See, e.g.*, Am. Compl. ¶¶ 87, 91–93, 125–27, 143, 214.)  By directly contacting Human Resources and alerting one of his supervising officers—who, it can be inferred, had an obligation to address Plaintiff's concerns and/or bring it to the attention of Human Resources—Plaintiff has plausibly alleged he engaged in a protected activity and made his employer aware of that activity.  Further, Plaintiff's allegations of the Individual Defendants' name-calling and mocking behavior, (*see id.* ¶¶ 160, 171–74), in addition to his transfer to a different courthouse because Dibello believed Plaintiff was "broken" because of his injuries, (*id.* ¶¶ 91–92), are sufficient to survive a motion to dismiss.  Thus, like Plaintiff's FMLA retaliation claim, Plaintiff's NYCHRL retaliation claim also survives, and the Individual Defendants' motion to dismiss with respect to this issue is denied.

## V.     Conclusion

Because Plaintiff has alleged plausible claims against the Individual Defendants for both retaliation under the FMLA and NYCHRL as well as disability discrimination under the NYCHRL, the Individual Defendants' motion to dismiss is DENIED.  The Clerk of Court is directed to terminate the pending motion.  (Doc. 30.)

The Individual Defendants shall file an answer to the Amended Complaint by May 25, 2018, and the parties shall appear for an initial pre-trial conference before me on May 31, 2018 at 10:30 a.m. in Courtroom 518 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.  The parties are further directed to meet and confer and, by May 29, 2018, submit a joint letter, not to exceed three (3) pages, providing the following in separate paragraphs:  (1) a brief description of the nature of the action and the principal defenses thereto; (2) a brief description of any contemplated motions; (3) a brief description of any discovery that has already taken place, and/or that which will be necessary for the parties to engage in meaningful settlement negotiations; (4) a brief description of prior settlement discussions and the prospect of settlement; (5) estimated length of trial; and (6) any other information that the parties believe may assist me in advancing the case to settlement or trial; including, but not limited to, a description of any dispositive issue or novel issue raised by the case.  Along with the letter, the parties shall jointly submit to me a proposed case management plan and scheduling order, a template for which is available at http://nysd.uscourts.gov/judge/Broderick.  The status letter and the proposed case management plan should be filed electronically on the Court's Electronic Case Filing system.

SO ORDERED.

Dated: May 15, 2018
     New York, New York

Vernon S. Broderick
United States District Judge